IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

NO. 97-30230
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

VS.

ANTONIO A. GARCIA and
ARTHUR S. HUEY, IV,

Defendants-Appellants

_____

Appeals from the United States District Court
for the Eastern District of Louisiana

_____

February 19, 1998

Before JONES and SMITH, Circuit Judges, and SHAW[*], District
Judge.

JOHN M. SHAW, District Judge:


I.  Proceedings Below

Following a jury trial, Antonio Garcia and Arthur S. Huey,

IV were convicted of conspiracy to distribute marijuana (count

1), making threats or using violence in order to collect an

---

[*] District Judge of the Western District of Louisiana, sitting by
designation.

extension of credit (count 2), and use of a firearm in relation to a crime of violence (count 3).[2]

The defendants appealed and argued that the jury selection process violated Batson v. Kentucky, 476 U.S. 79 (1986) and its progeny.  See United States v. Huey, 76 F.3d 638, 639-40 (5th Cir. 1996).  The court determined that the discriminatory jury selection method employed violated Batson and its progeny, reversed the defendants' convictions, and remanded the case for a new trial.  *Id.* at 641-42.

Following remand, the defendants waived their right to a jury trial, and the parties stipulated that the retrial would be based on the testimony and evidence admitted at the original trial.  The district court again found the defendants guilty of all three counts.[3]

## II.  Factual Background

Marshall Howell purchased 40-50 pounds of marijuana from Huey and Garcia over a one-year period.  Howell, who lived in Tuscaloosa, Alabama, was allowed to obtain 4 or 5 pounds of the drug at one time from Huey in New Orleans.  On some occasions,

---

[2]Garcia was sentenced to concurrent terms of imprisonment of 51 months on counts 1 and 2 and to a term of imprisonment of 60 months on count 3, to be served consecutively to the sentences imposed on counts 1 and 2.  Huey was sentenced to concurrent terms of imprisonment of 34 months on counts 1 and 2 and to a 60-month term of imprisonment on count 3, to be served consecutively to the sentences on counts 1 and 2.

[3]Huey was sentenced to concurrent terms of imprisonment of 30 months on counts 1 and 2 and to a 60-month term of imprisonment on count 3, to be served consecutively to the sentences on counts 1 and 2.  Garcia was sentenced to concurrent terms of imprisonment of 41 months on counts 1 and 2 and to a term of imprisonment of 60 months on count 3, to be served consecutively to the sentences imposed on counts 1 and 2.

Howell did not pay Huey for the marijuana until he had sold the drugs. During the initial transactions, Howell would travel to New Orleans and pick up 4 or 5 pounds of marijuana and return to Tuscaloosa to sell the drugs. He would then either return to New Orleans with the payment or send the money to Huey by Western Union. Sometimes, Howell paid "on the spot" and other times, he took the drugs with the expectation that he was to sell them and pay when he collected the money. Huey brought Howell a little less than 15 pounds of marijuana prior to Thanksgiving in 1993. Howell told Huey that he could pay him for two-thirds of the marijuana but that he did not have the remaining $5,900 due for the drugs and agreed to pay the remainder as soon as he got the money.

Huey waited in Tuscaloosa for payment for several weeks and then returned to New Orleans when he felt that Howell was not going to pay him. Garcia subsequently called Howell and told him that he was sending someone to his house to collect the money. Howell had several telephone conversations with Huey about the money, and Huey told him that if he did not pay the debt by the first of the year, something would happen to his family. Howell testified that he was given a few different deadlines but that the defendants agreed to the extensions because they had no other choice. Howell testified that he had agreed to meet the defendants in Mississippi on December 12 to pay the debt but that he had no intention of meeting them because he did not have the money. Howell fled to Birmingham because he feared that the

3

defendants would go to his Tuscaloosa apartment to collect it. The defendants went to Howell's apartment on December 12, ransacked the place, and left a message on his recorder. Huey and Garcia returned to the apartment the following evening and demanded their money from a friend of Howell's who was staying there. Garcia threatened to rape and kill Howell's mother and to kill Howell's brother if Howell did not pay.

Garcia made a threat to kill Howell's brother on Howell's mother's phone recorder on December 21 and claimed interest on the debt at the rate of $500 per day. Howell continued to receive calls from Huey, who continued to demand payment of the money due. Huey continued to press Howell for the money through January and told him that payment of the $6,000 principal would be sufficient. Howell testified that he never directly received the marijuana from Garcia but acknowledged that he owed him the money for the drugs delivered by Huey. After these incidents, Howell decided to cooperate with the FBI and tape his telephone calls, resulting in the indictment of Huey and Garcia.

### III. Issues on Appeal

A.   Garcia and Huey both contend that the evidence was insufficient to prove beyond a reasonable doubt that they extended credit to the victim.

B.   Huey also contends that there was insufficient evidence to prove beyond a reasonable doubt that Huey used or carried a firearm during a crime of violence.

C.   Additionally, Garcia contends that the court *a quo*

4

erred in denying him a three-level reduction of his sentence for acceptance of responsibility.

## IV.  Discussion

### A.   Extension of Credit:

Congress makes it a crime to knowingly participate or to conspire to participate in the use of any extortionate means "to collect or attempt to collect any extension of credit."  18 U.S.C. § 894(a)(1).

Extension of credit has been defined by this circuit to mean "to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."  United States v. Stokes, 944 F.2d 211, 214 (5th Cir. 1991).

The circuits are not in agreement on the showing necessary to prove an agreement to defer payment.  This circuit requires proof of some manifestation by the creditor of his assent to defer payment.  Stokes, supra.  Therein, the court explained that the agreement could be tacit or express and requires at a minimum, proof of conduct by the creditor manifesting assent to defer payments.  In Stokes, the evidence did not reveal any conduct on the part of the creditor tending to show his willingness to allow the victim any "slack."

In United States v. Natale, 764 F.2d 1042 (5th Cir. 1985), the court found there was an agreement to defer the payment of

5

the claim.  The court set forth the standard of review as to whether there is sufficient evidence to sustain a conviction beyond a reasonable doubt, stating that we must consider the evidence direct and circumstantial in the light most favorable to the Government.

Herein, the evidence supports a finding that Garcia and Huey extended credit by manifesting an assent to defer payment. Otherwise, the defendants would have only given Howell the amount of marijuana he could pay for rather than the full 15 pounds and allow him to pay for the balance at a later date.  The evidence in the record is clear that this type of arrangement was consistent with their prior course of dealing.

The district court determined that the evidence established that credit was extended to Howell at the initial delivery of the marijuana.  It further determined that a tacit agreement to defer payment was made at the time Howell was allowed to pay for only two-thirds of the drugs delivered to him by Huey.  The district court further determined that this agreement was the *modus operandi* based on Howell's testimony that on several occasions he had paid Huey for part of the marijuana and then wired or delivered the balance due at a later time.  The district court rejected the defendants' contention that they did not allow Howell any "slack."  The district court determined that the

defendants did not formulate their claims until they concluded that Howell did not intend to pay.

In determining that credit was extended, the court below must have been impressed with a "message [from] Garcia" left on Howell's mother's answering machine that acknowledged the debt and that interest was accruing daily. The standard of review for a district court's finding of guilt at a bench trial is whether the conviction is supported by substantial evidence. United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993).[4]

The panel in Stokes cited with approval the Seventh Circuit opinion of United States v. Boulahanis, 677 F.2d 586 (7th Cir. 1982), wherein the court found that the Government failed to prove a violation of 18 U.S.C. § 894. It stated that "[t]he extension of credit is a deliberate act by a creditor. It does not occur merely because a customer defaults. Section 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of credit previously extended." This view is on all fours with the court in Stokes. It should be noted, however, that Boulahanis also stands for the proposition that if additional time is given the victim to pay, that could constitute an agreement to defer payment of a debt and such a deferral would be within the reach of section 894.

---

[4]In applying the "substantial evidence" or the "sufficiency of the evidence standard", the court must consider the evidence in light most favorable to the Government and must determine whether the evidence is sufficient to justify the district court's determination that the defendant is guilty beyond a reasonable doubt.

7

In view of the evidence above, reviewed in the light most favorable to the Government, we affirm the finding of the district court that Garcia and Huey extended credit to Howell thus violating section 894. It should be made clear however, that our decision herein does not stand for the proposition that in every drug transaction where full payment is not made immediately upon delivery that there is an extension of credit that could bring section 894 into play.

The defendants in their briefs and at oral argument contend that the transaction was a consignment rather than an extension of credit and therefore, section 894 is not applicable herein. This is an attempt to liken the case to United States v. Wallace, 59 F.3d 333 (2d Cir. 1995), a prosecution stemming from a bank fraud scheme. Garcia and Huey's reliance on Wallace is misplaced. There, the Second Circuit held that the defendants did not "extend credit" under section 894; rather, "[t]he closest commercial analog to the [instant] transaction is a consignment in which the obligation to pay is contingent and no title passes. There was no indication that [the victim] would pay [the defendant] if the scheme to defraud the bank had failed." *Id.* at 339. The court concluded that "none of the evidence presented at trial amounted to the formation of a credit agreement, because [the defendant] and his representatives never 'agree[d]' to 'defer[]' the collection of their money." *Id.* at 339. Here, Garcia and Huey agreed to defer collection from the moment of the sale. It would be a stretch to characterize the drug deal as a

8

"consignment" in which Howell's obligation to pay Garcia and Huey was contingent on Howell's success in reselling the marijuana.

The defendants argue that the use of the word "consignment" in the overt act to describe the transaction in which Howell and others took possession of the marijuana, sold it at a significant price to make a profit, and then subsequently paid the defendants, has some legal significance. This court finds that such a misnomer does not change the result herein.[5] The AUSA conceded that he was responsible and that it was a bad choice of words. There was no serious contention that the use of the word caused any prejudice. The Government in the indictment was sufficiently particular and definite to advise the defendants of the charge against them so to enable them to prepare their defense. Further, there is nothing in the charge to the jury in the first trial to suggest that proof requiring the use of extortionate means in an attempt to collect an extension of credit would encompass a consignment. The instruction was clear that an extension of credit involves the deferral of a repayment

---

[5]Overt act 1. of Count 1 reads:

ANTONIO A. GARCIA and ARTHUR S. HUEY, IV distributed various quantities of marijuana to Marshall Howell and others on a consignment basis whereby Marshall Howell and others would take possession of the marijuana, sell it at a sufficient price to make a profit, and then subsequently pay ANTONIO A. GARCIA and ARTHUR S. HUEY, IV.

of a debt which rejects the concept of a consignment which creates no debt.[6]

## B. Use of a Firearm During a Crime

Huey challenges the sufficiency of the evidence supporting his conviction for using or carrying a firearm in relation to a crime of violence under 18 U.S.C. § 924(c)(1). Huey admits that he carried the weapon during the commission of a crime of violence but contends that he did not "use" it within the meaning of <u>Bailey v. United States</u>, 116 S.Ct. 501 (1995). If an indictment alleges separate offenses in the conjunctive, the Government is required to prove only one of the offenses to obtain a conviction. <u>United States v. Merida</u>, 765 F.2d 1205, 1222 (5th Cir. 1985).

Huey acknowledges that he was carrying the weapon during the commission of a crime of violence. There was sufficient evidence

---

[6]The court instructed the jury on the elements of the offense as follows:

> Now I am going to give you the elements with respect to Count 2. Count 2 is as follows:
> Title 18 of U.S. Code Section 894(a)(1) makes it a crime to conspire in the use of extortionate means in an attempt to collect an extension of credit.
> An 'extortionate means' is any means which in the use or an express or implicit threat of use of violence or other criminal means to cause harm to the person, reputation, or property of any person.
> To extend credit means to make or renew any loan or to enter into any agreement, tacit or expressed, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.
> For you to find the defendants guilty of this crime, you must be convinced the government has proved the following beyond a reasonable doubt:
> That two or more persons made an agreement to commit the crime of the use of extortionate means in an attempt to collect an extension of credit as alleged in Count Two.

10

to support Huey's conviction for carrying a firearm.

C.    Acceptance of Responsibility

Garcia claims that the district court misapplied the guidelines by failing to reduce his offense level by an additional level for acceptance of responsibility. He argues that he is entitled to the one-level reduction because he never denied his participation in the offense and that after remand, he consistently indicated a desire to accept responsibility and agreed to stipulate to the evidence to avert the time and expense of another trial. He argues that he should not be penalized for exercising his right to appeal a question of law. He states that he only requested a new trial to preserve the sufficiency of the evidence.

This court reviews a district court's finding on acceptance of responsibility for clear error but under a standard of review even more deferential than a pure clearly erroneous standard. United States v. Gonzales, 19 F.3d 982, 983 (5th Cir. 1994); United States v. Tello, 9 F.3d 1119 (5th Cir. 1993). Section 3E1.1(b) sets forth a three-part test to determine whether a defendant is entitled to a one-level reduction. The sentencing court is directed to grant the additional decrease if:

1.   the defendant qualifies for the basic two-level decrease for acceptance of responsibility under section 3E1.1(a);

2.   the defendant's offense level is 16 or higher before the two-level reduction under section

11

3E1.1(a); and,

3.      the defendant timely assisted authorities by
        either providing complete information to the
        Government concerning his own involvement in
        the offense or timely notified authorities of
        his intention to enter a plea of guilty,
        thereby permitting the Government to avoid
        preparing for trial and permitting the court
        to allocate its resources efficiently.

Tello at 1124-1125.

Garcia meets the first two requirements of the Tello test but not the third.[7]  The district court accordingly did not err in denying Garcia an additional one-level reduction.

AFFIRMED.

---

[7]In United States v. Leonard, 61 F.3d 1181, 1187 (5th Cir. 1995), the court determined that the defendant's waiver of his right to jury trial and agreement to stipulate to most of the evidence did not entitle him to an additional one-level adjustment because he did not plead guilty and the Government was still required to use its resources at trial.

12